# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**
**No. 23-1235V**

|  |  |
|---|---|
| KEVIN BROWN, | Chief Special Master Corcoran |
| Petitioner, | |
| v. | Filed: March 11, 2026 |
| SECRETARY OF HEALTH AND HUMAN SERVICES, | |
| Respondent. | |

*Catherine Wallace Costigan, Maglio Christopher & Toale, PA, Washington, DC, for Petitioner.*

*Jamica Marie Littles, U.S. Department of Justice, Washington, DC, for Respondent.*

### RULING ON ENTITLEMENT[1]

On August 3, 2023, Kevin Brown filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that he suffered a shoulder injury related to vaccine administration ("SIRVA") caused by an influenza ("flu") vaccine administered on September 17, 2020. Petition at 1. The case was assigned to the Special Processing Unit of the Office of Special Masters.

For the reasons set forth below, I find that Petitioner received the subject vaccination in his left shoulder on September 17, 2020, as alleged, and that he otherwise

---

[1] Because this Ruling contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Ruling will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

has satisfied the requirements for a Table SIRVA claim. Petitioner is thus entitled to compensation.

## I.      Relevant Procedural History

Following a medical review of this case, Respondent submitted his Rule 4(c) Report in defense of this claim in November 2024. ECF No. 28. Petitioner subsequently filed a Motion for a Ruling on the Record ("Motion"), arguing that he can establish he received the subject vaccination in the left arm on September 17, 2020, as alleged. Mot. at 18-24, ECF No. 29. Petitioner did not otherwise address the merits of his Table SIRVA claim. *See generally id.* Respondent filed a Brief in reaction thereafter, maintaining his previous arguments regarding proof of vaccination and Petitioner's inability to establish a Table claim. Resp., ECF No. 30.

Petitioner later filed supplemental evidence in support of proof of vaccination, including a copy of his vaccine appointment confirmation and other information regarding the large-scale flu vaccination clinic provided by his employer. ECF No. 31. He also submitted a letter from his treating physician (authored in September 2024). ECF No. 32. Finally, Petitioner filed his Reply, arguing the evidence supports a finding of proof of vaccination, vaccine situs, and that he suffered a Table SIRVA claim. Reply, ECF No. 34. This matter is now ripe for resolution.

## II.      Relevant Factual Evidence

On September 17, 2020 – the alleged date of his receipt of the subject vaccination – Petitioner called his workplace on two different occasions (in late morning and mid-afternoon) regarding possible COVID-19 exposure at his office at the Veteran's Association ("VA"). Ex. 9 at 103-05. Though Petitioner reported symptoms including diarrhea and congestion/runny nose early in the day, those symptoms later improved, and his COVID-19 test was negative; he was told he could return to work that day. *Id.* at 103. There is no reference to Petitioner's receipt of a vaccination on this date in these medical records.

Despite this omission in the records from his workplace, Petitioner submitted supplemental information surrounding his receipt of the subject vaccination. For example, Petitioner submitted an email from his employer to VA staff, dated September 15, 2020, at 12:05PM (thus two days prior to the alleged vaccination), advising that "Employee Health will begin providing flu shots on [] 9/16. Appointments run every ten minutes from 6 am to 3 pm . . . at the Employee Health door in parking lot 4[.]" Ex. 18 at 3.

Petitioner also filed an email confirmation for his vaccination appointment on September 17, 2020. Ex. 17. The email is from an automated sign-up system to Petitioner, dated September 15, 2020, at 12:40PM, with a subject line reading "Flu Shot Appointment Confirmation." Ex. 18 at 1. The message thanks Petitioner for signing up and states "[y]ou're all signed up for "Flu Shot Clinic[,]" 7:50AM on 09/17/2020 (Thu.)." *Id.* at 1-2.

A third email communication from Petitioner's employer to VA staff is dated September 21, 2020, and notes a change to the vaccine administration process – involving two time slots at a different location in another parking lot. Ex. 18 at 1. The email also advises that "[a] copy of vaccine records will not be given at this location, but employee health will document the vaccine has been administered and will be able to provide a copy of that record later." *Id.*

Petitioner's declaration (drafted in July 2024) attests that he received his vaccination in his left arm on September 17, 2020. Ex. 15 ¶ 1. He described the circumstances of this vaccination and notes that he received the shot while in the parking lot of his workplace. *Id.* ¶ 4. Petitioner recalls that when he received the vaccine in his left shoulder, "it felt like it was administered to [his] shoulder joint instead of [his] deltoid muscle." *Id.* He states that "[i]mmediately" upon his receipt of the vaccine, he had pain in his left shoulder. *Id.* ¶ 5.

Less than one month post vaccination, on October 14, 2020, Petitioner sought care with Employee Health Services for his left shoulder pain. Ex. 9 at 107. He reported that he "received influenza vaccination to the left high deltoid region on 9/17/20[]" and "[w]ithin a day, pain to shoulder became much worse, felt to be in the joint." *Id.* Petitioner also reported "significant pain to the left shoulder with sleeping and when holding something heavy." *Id.* He also "point[ed] to the region just anterior to L deltoid and approximately 1 cm distal to joint space as where the influenza vaccination was administered." *Id.* A physical examination revealed reduced range of motion ("ROM") and strength in the left shoulder. *Id.* The treater assessed Petitioner with SIRVA and recommended Naproxen, ROM exercises, and to avoid heavy overhead use of the shoulder. *Id.* The treater also advised Petitioner regarding reporting of the "adverse reaction" and to file a workers' compensation claim. *Id.*

On November 4, 2020, Petitioner contacted his treater at Employee Health "regarding L shoulder SIRVA . . . secondary to injection on 9/17/20[.]" Ex. 5 at 18. Petitioner reported a "failure to improve with x2 weeks Naproxen and ROM exercises[;]" he rated his pain at a 6-9/10. *Id.* Petitioner stated that he was unable to rest on his shoulder when sleeping, and that he "feels pain is to region of rotator cuff." *Id.* The assessment included "SIRVA L shoulder, not improving." *Id.* The treater recommended

physical therapy ("PT") and also wrote Petitioner a letter in support of his worker's compensation claim. *Id.*

The letter drafted by Petitioner's treater at Employee Health is dated November 4, 2020, and is contained in the visit notes. Ex. 5 at 18. The treater states in it that Petitioner was referred to PT "for L SIRVA . . . Date of Injury 9/17/20[.]" Ex. 5 at 18. The treater wrote that Petitioner "received flu immunization L shoulder on 9/17/20, developed pain subsequently near region of injection. No improvement with rest and 2 weeks Naproxen therapy." *Id.* And, the "current diagnosis" was listed as "L SIRVA." *Id.*

On November 10, 2020, Petitioner filled out a questionnaire in pursuit of his workers' compensation claim. Ex. 11 at 1283. Petitioner reported left shoulder pain as an "immediate effect" of his injury, along with weakness and stiffness in the shoulder joint. *Id.* The form also contains a notation that Petitioner did not file his workers' compensation claim in a timely manner, as the date on which he "reasonably should have been aware of a possible relationship between [his] condition and [his] employment [was] 09/17/2020[,]" but the claim was filed on November 4, 2020. *Id.* Petitioner responded to this assertion and explained that he "thought [he] filed the claim on 10/14/2020 per recommendation [of his treater,]" as that is when he told his treater about the injury. *Id.*

Later that month, on November 24, 2020, Petitioner established care with an orthopedist. Ex. 4 at 1057. Petitioner reported that his left shoulder pain "ha[d] been a problem: sept [sic] 17, 2020." *Id.* He explained that "he got a flu vaccine from the VA and its been hurting since that." *Id.* Petitioner described his pain as constant and rated it at a 6/10. *Id.* When asked if the "[p]ain radiate[d] to arm[,]" Petitioner answered, "no." *Id.* An examination revealed pain with ROM and rotator cuff testing. *Id.* at 1059. The orthopedist's impression was "[l]eft shoulder subacromial bursitis and rotator cuff irritation due to influenza vaccine." *Id.* The treater also noted that Petitioner "had really painful shoulder since that time." *Id.* Petitioner's orthopedist wrote that Petitioner asked "whether or not another flu shot would be indicated" and the orthopedist thought "it would be worth the risk to repeat the flu shot[.]" *Id.* Although he did not receive a repeat flu vaccine at that time, Petitioner received a steroid injection in the left shoulder and was referred to PT. *Id.*

Petitioner attended his initial PT evaluation for left shoulder pain on December 3, 2020. Ex. 2 at 445. The onset date was listed as "09/01/20." *Id.* at 446. The history states that Petitioner "presents with L shoulder pain since 9/2020 after getting a flu shot." *Id.* Petitioner reported improvement following receipt of his steroid injection, but ongoing problems with lifting his toddler, carrying, overhead motion, and sleeping on the left side. *Id.* Petitioner also described a feeling like his shoulder "falls out of socket and separate[s] a little bit[,]" as well as "neck pain that radiates down L scapula." *Id.* He identified the

location of his symptoms as the "L lateral shoulder." *Id.* Upon examination, Petitioner exhibited limited ROM and tenderness throughout his left shoulder. *Id.* at 446-47. The assessment included "[s]igns and symptoms consistent with L shoulder pain after vaccine injection, [subacromial pain syndrome ("SAPS"),] and bursitis." *Id.* at 447.

During a contact with Employee Health on December 16, 2020, Petitioner reported that he "over did it" with PT and was having increased discomfort. Ex. 5 at 41. The assessment was "SIRVA secondary to workplace vaccination with flu." *Id.* (emphasis omitted).

On January 5, 2021, Petitioner followed up with his orthopedist. Ex. 2 at 431. The orthopedist noted Petitioner's history of "irritation of his rotator cuff in the setting of a flu shot that may have been given in the subacromial space." *Id.* Petitioner noted he had "generally [] continued to improve with 1-3 times weekly home exercises." *Id.* A physical examination revealed tenderness of the proximal biceps, with normal ROM. *Id.* The orthopedist's impression was "[l]eft shoulder pain in the setting of a flu shot[.]" *Id.* The treater prescribed diclofenac for sleep and recommended an ultrasound guided injection. *Id.* at 431-32. When Petitioner saw his primary care physician ("PCP") the same day, the treater prescribed gabapentin for ongoing pain and sleep difficulties. Ex. 4 at 1007-11.

Petitioner returned to his orthopedist on February 25, 2021, and reported that he was not taking his gabapentin. Ex. 2 at 404. He rated his pain at a 4/10. *Id.* at 406. Petitioner received a glenohumeral joint injection in the left shoulder. *Id.*

Nearly a month and a half after his receipt of his second injection (on April 8, 2021), Petitioner sought another PT evaluation for left shoulder pain. Ex. 2 at 383. The onset date was listed as "09/17/20." *Id.* at 384. Petitioner reported that he had left shoulder pain "since last September (9/17/20) when receiving a flu shot." *Id.* He also complained of "mild pain in L scapula area that came several weeks after getting the shot," weakness when picking up and holding his children, and "intermittent neck pain, but little to none currently." *Id.* at 384-85. The treater thought that Petitioner's physical findings (i.e., pain with ROM) were "consistent with L shoulder pain [and] bicep tendinopathy" that was "more related to a flare up associated with the bicep tendon after flu shot into that area." *Id.* at 387. Despite the recommendation for treatment with six to twelve weeks of PT, Petitioner did not return for further treatment with PT. *Id.* at 388.

Later that month, on April 27, 2021, Petitioner returned to his orthopedist. Ex. 2 at 367. The orthopedist reiterated Petitioner's history, noting that he "had subacromial irritation due to a flu shot that may have been given in the subacromial space and this has been a work-related issue for the last number of months." *Id.* Physical findings were

consistent with tenderness to the anterior and lateral aspects of the shoulder, positive impingement signs, and normal ROM. *Id.* The orthopedist felt that Petitioner was failing conservative measures and while he was improving, he was not "completely better." *Id.* Two days later (April 29, 2021), the orthopedist administered Petitioner repeat left shoulder glenohumeral and subacromial steroid injections. *See id.*; *see also id.* at 337.

Petitioner underwent an MRI of the left shoulder on June 10, 2021 – which revealed supraspinatus tendinosis and degenerative tearing of the left posterior and inferior labrum associated with paralabral cysts. Ex. 2 at 327-28. When he followed up with his orthopedist the next day, the orthopedist felt the "degenerative labral pathology [] does not seem to be clinically relevant[,]" and diagnosed Petitioner with left shoulder rotator cuff tendinopathy. *Id.* at 297. The orthopedist referred Petitioner back to PT and to an orthopedic surgeon for possible subacromial decompression. *Id.*

On June 14, 2021, Petitioner sought care with an orthopedic surgeon. Ex. 2 at 275. He reported left shoulder pain that "began 09/17/2020 due to flu shot." *Id.* at 276. The "type of injury" was documented as "flu injection[,]" and the date of onset was listed as "09/17/2020[.]" *Id.* Petitioner noted performing at-home ROM exercises and that his prior injections "only helped temporarily." *Id.* The treater diagnosed Petitioner with left shoulder pain and suspected biceps tendonitis; he recommended another steroid injection and possible arthroscopic surgery. *Id.* at 280-81.

During another PT consultation on June 17, 2021, Petitioner reported that he had a "[f]lu shot 2020 which has caused significant shoulder pain since. Feels this has contributed to his increase in back pain." Ex. 3 at 20. The chief complaint was listed as "R sided back/buttocks pain."[3] *Id.*

When Petitioner followed up with his orthopedic surgeon on June 30, 2021, he received a left proximal biceps tendon sheath steroid injection to address his pain. Ex. 2 at 255. He thereafter returned to his orthopedist on September 3, 2021. Ex. 2 at 219. The orthopedist maintained her belief that Petitioner's "rotator cuff tendinopathy was related to poorly placed flu shot," and that Petitioner had not responded to conservative measures. *Id.* at 220. Petitioner's orthopedist recommended surgery and deep tissue massages.[4] *Id.* at 221.

---

[3] Petitioner subsequently completed four PT sessions focused on his back pain, until August 20, 2021. *See* Ex. 3 at 5, 7, 9, 11.

[4] Petitioner attended one massage therapy appointment on February 7, 2022, but was subsequently informed his insurance would not cover the treatment; he did not return thereafter. Ex. 6 at 2.

At the direction of his orthopedist, Petitioner had a surgical consultation on September 23, 2021. Ex. 2 at 208. Petitioner noted that his left shoulder pain "began 09/17/20 associated with getting a flu vaccine from the VA, pain ever since that." *Id.* He "denie[d] pain radiating down to the hand, neck pain, or numbness." *Id.* Following a physical examination (consistent with reduced ROM, pain with rotator cuff testing, and crepitus), the orthopedic surgeon assessed Petitioner with "left vaccine-induced subacromial bursitis." *Id.* at 210-11. Petitioner opted to proceed with surgery. *Id.* at 211. This same treater authored a letter in support of Petitioner's workers' compensation claim (dated December 3, 2021,) and wrote that at the time of the September 2021 visit, Petitioner had a "full year of shoulder pain after a flu vaccine given on 9/17/2020." Ex. 11 at 822.

On March 14, 2022 (thus nearly 18 months post vaccination), Petitioner underwent a left shoulder arthroscopic debridement and subacromial decompression. Ex. 4 at 583. The history taken during this visit notes that Petitioner's left shoulder pain "began 09/17/20 associated with getting a flu vaccine from the VA[.]" *Id.* The post-operative diagnosis included left shoulder internal derangement and subacromial impingement syndrome. *Id.* at 587. The treater also noted secondary findings, including osteoarthritis and full thickness chondral loss – "not reliably or durably addressed with arthroscopic debridement." Ex. 11 at 55. Therefore, the treater did not know how much relief Petitioner would experience from the procedure. *Id.*

From March to November 2022, Petitioner completed ten PT sessions to address his ongoing left shoulder symptomology. *See,* e.g., Ex. 2 at 45, 105, 184. He showed steady progress throughout his treatment; however, at his final session on November 18, 2022, he experienced an exacerbation of pain, attributable to "excessive yard work." *See id.* at 47.

In December 2022, Petitioner returned to his orthopedist complaining of "persistent shoulder pain . . . all along the medial scapular border . . . [which radiated] up into his neck." Ex. 2 at 33-34. An examination showed tenderness in the medial scapular region and pain with rotator cuff strength training. *Id.* at 33. The orthopedist diagnosed Petitioner with left periscapular pain and recommended a subscapular bursa injection or a subscapular nerve block. *Id.* at 33-34. Petitioner received a scapulothoracic bursa injection and a trigger point injection on January 18, 2023. *Id.* at 22-23.

By January 30, 2023, Petitioner followed up with his PCP and reported improvement in his left shoulder symptoms. Ex. 4 at 118. He noted his shoulder was "by and large much better [despite a] few instances of acute pain[.]" *Id.* at 120. A physical examination was normal; the PCP prescribed pain medications as needed. *Id.* at 119.

Petitioner continued to receive intermittent treatment for his left shoulder symptoms thereafter. During a pain management psychology intake examination on March 27, 2023, Petitioner reported "left shoulder pain that first presented following a vaccination he had in his left arm 3 years ago." Ex. 4 at 99. He also saw a pain management specialist the same day and was diagnosed with chronic pain syndrome and chronic left shoulder pain. *Id.* at 51-55. And, during a PT session that day, Petitioner reported pain primarily under the left shoulder blade, with "some pain radiating to the superior/medial border of the scapula and to the base of the neck giving him 'cluster headaches.'" *Id.* at 21-22.

He thus continued treating through March 2024. This ongoing treatment included repeat scapulothoracic bursa injections in the left shoulder on September 5, 2023, and February 27, 2024. Ex. 14 at 49; Ex. 16 at 26-28. More so, Petitioner attended PCP follow up visits on September 26 and December 11, 2023. *See* Ex. 14 at 30; *see also id.* at 5-7. Though he experienced "more good days than bad[,]" he continued to experience difficulties sleeping. *Id.* at 30. Petitioner's last visit for left shoulder pain (not improving with care) occurred on March 25, 2024.[5] *See,* e.g., Ex. 16 at 7-13.

## III.    Legal Authority

Pursuant to Vaccine Act Section 13(a)(1)(A), a petitioner must prove, by a preponderance of the evidence, the matters required in the petition by Vaccine Act Section 11(c)(1). Any petitioner alleging a Vaccine Act claim has one foundational evidentiary obligation: to prove that he "received a vaccine set forth in the Vaccine Injury Table." Section 11(c)(1)(A). Additionally, when alleging a Table SIRVA injury as in this case, a petitioner must show he received the vaccine intramuscularly in his injured upper arm/shoulder. 42 C.F.R. § 100.3(c)(10) (2017) (Qualifications and Aids to Interpretation for a Table SIRVA).

In addition to requirements concerning the vaccination received, the duration and severity of petitioner's injury, and the lack of other award or settlement,[6] a petitioner must establish that he suffered an injury meeting the Table criteria, in which case causation is

---

[5] Petitioner's treating orthopedist also submitted a letter on Petitioner's behalf, dated September 26, 2024, and thus filed along with Petitioner's Reply brief. Ex. 19. The treater noted Petitioner's left shoulder pain "started immediately following a vaccination 9/17/2020." *Id.* at 1.

[6] In summary, a petitioner must establish that she received a vaccine covered by the Program, administered either in the United States and its territories or in another geographical area but qualifying for a limited exception; suffered the residual effects of her injury for more than six months, died from her injury, or underwent a surgical intervention during an inpatient hospitalization; and has not filed a civil suit or collected an award or settlement for her injury. *See* § 11(c)(1)(A)(B)(D)(E).

presumed, or an injury shown to be caused-in-fact by the vaccination she received. Section 11(c)(1)(C).

Section 11(c)(1) also contains requirements concerning the type of vaccination received and where it was administered, the duration or significance of the injury, and the lack of any other award or settlement. *See* Section 11(c)(1)(A), (B), (D), and (E). With regard to duration, a petitioner must establish that he suffered the residual effects or complications of such illness, disability, injury, or condition for more than six months after the administration of the vaccine. Section 11(c)(1)(D).

The most recent version of the Table, which can be found at 42 C.F.R. § 100.3, identifies the vaccines covered under the Program, the corresponding injuries, and the time period in which the particular injuries must occur after vaccination. Section 14(a). Pursuant to the Vaccine Injury Table, a SIRVA is compensable if it manifests within 48 hours of the administration of an influenza vaccine. 42 C.F.R. § 100.3(a)(XIV)(B). A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:

(i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;

(ii) Pain occurs within the specified time frame;

(iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and

(iv) No other condition or abnormality is present that would explain the patient's symptoms (*e.g.* NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10).

A special master must consider, but is not bound by, any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury or illness that is contained in a medical record. Section 13(b)(1). "Medical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the

balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Accordingly, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Hum. Servs.*, No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). However, the Federal Circuit has recently "reject[ed] as incorrect the presumption that medical records are always accurate and complete as to all of the patient's physical conditions." *Kirby v. Sec'y of Health & Hum. Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021). Medical professionals may not "accurately record everything" that they observe or may "record only a fraction of all that occurs." *Id.*

Medical records may be outweighed by testimony that is given later in time that is "consistent, clear, cogent, and compelling." *Camery v. Sec'y of Health & Hum. Servs.*, 42 Fed. Cl. 381, 391 (1998) (citing *Blutstein v. Sec'y of Health & Hum. Servs.*, No. 90-2808, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998). The credibility of the individual offering such testimony must also be determined. *Andreu v. Sec'y of Health & Hum. Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Hum. Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id.*

The special master is obligated to fully consider and compare the medical records, testimony, and all other "relevant and reliable evidence contained in the record." *La Londe Sec'y of Health & Hum. Servs.*, 110 Fed. Cl. 184, 204 (2013) (citing § 12(d)(3); Vaccine Rule 8); *see also Burns v. Sec'y of Health & Hum. Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that it is within the special master's discretion to determine whether to afford greater weight to medical records or to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is rational).

10

## IV.    Factual Findings and Ruling on Entitlement

### A.  Proof of Vaccination and Situs

Any petitioner alleging a Vaccine Act claim has one foundational evidentiary obligation: to prove that he "received a vaccine set forth in the Vaccine Injury Table." Section 11(c)(1)(A). Additionally, when alleging a Table SIRVA injury as in this case, a petitioner must show he received the vaccine intramuscularly in his injured upper arm/shoulder. 42 C.F.R. § 100.3(c)(10) (2017) (Qualifications and Aids to Interpretation for a Table SIRVA).

There are many Program cases in which direct proof of vaccine administration is missing. But when presented with sufficient preponderant *circumstantial* evidence – such as consistent references in contemporaneously created medical records and/or credible witness testimony – special masters routinely find the alleged vaccination to have occurred. *Hinton v. Sec'y of Health & Hum. Servs.,* No. 16-1140V, 2018 WL 3991001, at *10-11 (Fed. Cl. Spec. Mstr. Mar. 9, 2018); *Gambo v. Sec'y of Health & Hum. Servs.,* No. 13-0691V, 2014 WL 7739572, at *3-4 (Fed. Cl. Spec. Mstr. Dec. 18, 2014); *Lamberti v. Sec'y of Health & Hum. Servs.,* No. 99-0507V, 2007 WL 1772058, at *7 (Fed. Cl. Spec. Mstr. May 31, 2007). Of course, not every case succeeds where such direct proof is lacking. Evidence has been found to be insufficient in cases involving inconsistencies related to Petitioner's vaccination status and/or the events surrounding vaccination. *Matthews v. Sec'y of Health & Hum. Servs.,* No. 19-0414V, 2021 WL 4190265, at *6-7, 9 (Fed. Cl. Spec. Mstr. Aug. 19, 2021), *aff'd,* 157 Fed. Cl. 777 (2021) (petitioner's reliance primarily on later notations of an allergic reaction).

In this case, direct proof of vaccine administration is lacking. However, Petitioner has submitted consistent evidence documenting the circumstances surrounding his receipt of a vaccination at his place of employment. For instance, though filed *after* Respondent had an opportunity to address the existing record, Petitioner has produced emails confirming that his place of employment offered a large-scale flu clinic in his workplace parking lot in September 2020, *and* that Petitioner in fact made an appointment for his receipt of a flu vaccine at this parking lot clinic on September 17, 2020, at 7:50AM – the date of the alleged subject vaccination. *See,* e.g., Ex. 18 at 1-2. These email records are deserving of some weight.

More so, the medical records consistently reference a specific vaccination date, with an onset of injury following receipt of a flu vaccine – factors that are helpful to Petitioner given the absence of direct administration proof. *See,* e.g., Ex. 9 at 107 (an October 14, 2020 report to Employee Health Services that his left shoulder pain began

11

when he "received influenza vaccination to the left high deltoid region on 9/17/20"); Ex. 5 at 18 (a November 4, 2020 report to Employee Health "regarding L shoulder SIRVA . . . secondary to injection on 9/17/20"); Ex. 4 at 1057 (a November 24, 2020 orthopedic report that his left shoulder pain "ha[d] been a problem: sept [sic] 17, 2020" and that "he got a flu vaccine from the VA and its been hurting since that."); Ex. 2 at 383 (an April 8, 2021 PT report of left shoulder pain "since last September (9/17/20) when receiving a flu shot.").

Petitioner's records otherwise reflect a consistent course of events suggesting vaccine administration did occur. For instance, the medical records show Petitioner described the onset of shoulder pain following his receipt of a flu vaccine *at work on September 17, 2020. See,* e.g., Ex. 4 at 1057 (a November 24, 2020 history including that Petitioner "got a flu vaccine from the VA and its been hurting since that."); Ex. 2 at 367 (a April 27, 2021 orthopedic report of "subacromial irritation due to a flu shot that may have been given in the subacromial space and this has been a work-related issue for the last number of months."); *id.* at 208 (a September 23, 2021 orthopedic surgery report of pain that "began 09/17/20 associated with getting a flu vaccine from the VA, pain ever since that."). Such consistent record entries further support Petitioner's allegations concerning proof of vaccination.

And, notably, Petitioner submitted and received approval for a workers' compensation claim as a direct result of his receipt of the subject September 17th flu vaccination at work. *See,* e.g., Ex. 11 at 1270-76, 1290. The presence of this initiated action makes resolution of this question more straightforward. *Prescott v. Sec'y of Health & Hum. Servs.,* No. 21-2005V, 2024 WL 1366402 (Fed. Cl. Spec. Mstr. Feb. 29, 2024) (relying on evidence that the petitioner's employer did not contest the workers' compensation claim documenting the alleged date of vaccination and actually referred the petitioner for treatment as a result of the vaccine injury to establish a reasonable belief that the petitioner received the subject vaccine on the date in question).

The contemporaneous medical records, paired with the September 2020 email communications regarding the vaccination clinic information (put on by Petitioner's employer, the VA), thus support proof of vaccination in this case. While it would have been preferable for Petitioner to have provided the actual vaccine consent form for his receipt of the September 17, 2020 flu vaccination (and to provide such evidence sooner than he did), the circumstantial evidence submitted tips the scale ever so slightly in favor of Petitioner here.

Additionally, Petitioner has likewise provided preponderant evidence establishing that he received the subject flu vaccine intramuscularly in his *left deltoid* on September 17, 2020, as alleged. The record of Petitioner's October 14, 2020 report to Employee

Health Services, noting he "received influenza vaccination to the left high deltoid region on 9/17/20," (Ex. 9 at 107), is particularly persuasive. Petitioner even specifically "point[ed] to the region just anterior to L deltoid . . . as where the influenza vaccination was administered" to reflect the location of his pain; and physical findings were specific to the left shoulder, culminating in a SIRVA diagnosis of the left shoulder. *See id.* This record is from less than one month post vaccination and is the most contemporaneous record other than the vaccine administration record itself, that is lacking in this case.

Indeed, while I acknowledge that there is no vaccine administration record *itself*, all other medical records and Petitioner's declaration support a finding that the covered flu vaccine was administered in Petitioner's left arm. Moreover, in addition to Petitioner's self-reports to treaters and his own statements in his declaration, his medical records consistently document diagnostic testing, physical therapy exercises, and treatment of Petitioner's left shoulder. To rule otherwise, the overall record would need to contain more instances in which the counter situs was suggested or supported. Petitioner has thus established by preponderant evidence that he received the subject vaccination in his left deltoid on September 17, 2020.

### B. Other Table SIRVA Elements

After a review of the entire record, I find that a preponderance of the evidence demonstrates that Petitioner has satisfied the QAI requirements for a Table SIRVA.

### 1. Petitioner Has No Prior Left Shoulder Condition or Injury

The first requirement for a Table SIRVA is a lack of problems associated with the affected shoulder prior to vaccination that would explain the symptoms experienced after vaccination. 42 C.F.R. § 100.3(c)(10)(i). Respondent has not contested that Petitioner meets this criterion, and there is nothing in the filed evidence to suggest otherwise.

### 2. Onset of Petitioner's Injury Occurred within 48 Hours of his Vaccination

The second requirement for a Table SIRVA is that the onset of shoulder pain began within 48 hours of the subject vaccination. 42 C.F.R. § 100.3(c)(10)(ii). Respondent's objection to this criterion is rooted in the fact that (according to Respondent) there is no evidence that Petitioner actually received a flu vaccine on September 17, 2020, as alleged, and thus no evidence that the onset of his shoulder symptoms occurred within 48 hours of this vaccination. Respondent's Report at 16.

13

As discussed above, however, Petitioner has established that he likely received the subject vaccination in his left deltoid on September 17, 2020. And on essentially every post-vaccination encounter thereafter, Petitioner specifically reported the onset of his pain beginning on September 17th – thus the same day as his receipt of the subject vaccination. *See,* e.g., Ex. 9 at 107 (an October 14, 2020 Employee Health Services report of left shoulder pain when he "received influenza vaccination to the left high deltoid region on 9/17/20"); Ex. 4 at 1057 (a November 24, 2020 orthopedic report that his left shoulder pain "ha[d] been a problem: sept [sic] 17, 2020" after "he got a flu vaccine from the VA and its been hurting since that."); Ex. 2 at 445-46 (a December 3, 2020 PT report of "L shoulder pain since 9/2020 after getting a flu shot."); *id.* at 383 (an April 8, 2021 PT report of left shoulder pain "since last September (9/17/20) when receiving a flu shot."); *id.* at 275-76 (a June 14, 2021 orthopedic surgery report of shoulder pain that "began 09/17/2020 due to flu shot."). These entries provide sufficient support for Petitioner's assertions that his shoulder pain began immediately post vaccination and therefore within the Table's two-day window. *See generally* Ex. 15.

### 3. Petitioner's Pain was Limited to his Left Shoulder

The third QAI requirement for a Table SIRVA requires a petitioner's pain and reduced range of motion to be "limited to the shoulder in which the intramuscular vaccine was administered." 42 C.F.R. § 100.3(c)(10)(iii).

Respondent contests Petitioner's satisfaction of this element. Respondent's Report at 15-16. In particular, he argues that Petitioner "repeatedly reported that his shoulder pain extended into his neck, lower back, and scapular region, outside of his vaccinated left shoulder." *See id.* (citing Ex. 2 at 33, 384-85, 446; Ex. 3 at 20; Ex. 4 at 21-23; Ex. 6 at 2).

But there is a preponderance of evidence that Petitioner's pain was limited to his left shoulder. First, the filed record establishes that Petitioner's records consistently report left shoulder pain and loss of ROM, which are consistent with other SIRVA cases. Petitioner's diagnostic procedures were also limited to his left shoulder, and he received treatment for left *shoulder* pain, specifically.

Second, although there are references to pain in Petitioner's neck, scapular region, and low back in some records, the majority of other records support a finding that Petitioner's pain was limited to his left shoulder and, more so, originated from the shoulder. *See,* e.g., Ex. 4 at 1057 (a November 24, 2020 orthopedic report of left shoulder pain but "no" pain that "radiate[d] to arm"); Ex. 2 at 445-46 (a December 3, 2020 PT report of left shoulder pain and "neck pain that radiates down L scapula[,]" but identifying the

14

location of his symptoms as the "L lateral shoulder."); *id.* at 383-85 (an April 8, 2021 PT report of left shoulder pain and "mild pain in L scapula area[,]" weakness when picking up and holding his children, and "intermittent neck pain, but little to none currently."); Ex. 3 at 20 (a June 17, 2021 PT report that he felt his left shoulder pain "ha[d] contributed to his increase in back pain."); Ex. 2 at 208 (a September 23, 2021 surgery note "den[ying] pain radiating down to the hand, neck pain, or numbness."); *id.* at 33-34 (a December 2022 orthopedic report of left shoulder pain "all along the medial scapular border . . . [which radiated] up into his neck.").

In the Program, special masters have found that claims involving musculoskeletal pain *primarily* occurring in the shoulder are valid under the Table even if there are additional allegations of pain extending to adjacent parts of the body. *K.P. v. Sec'y of Health & Hum. Servs*., No. 19-65V, 2022 WL 3226776, at *8 (Fed. Cl. Spec. Mstr. May 25, 2022) (holding that "claims involving musculoskeletal pain primarily occurring in the shoulder are valid under the Table even if there are additional allegations of pain extending to adjacent parts of the body").

The third QAI criterion is intended to "guard against compensating claims involving patterns of pain or reduced [ROM] indicative of a contributing etiology beyond the confines of a musculoskeletal injury to the affected shoulder." *Grossmann v. Sec'y of Health & Hum. Servs.,* No. 18-0013V, 2022 WL 779666, at *15 (Fed. Cl. Spec. Mstr. Feb. 15, 2022); *Werning v. Sec'y of Health & Hum. Servs.,* No. 18-0267V, 2020 WL 5051154, at *10 (Fed. Cl. Spec. Mstr. July 27, 2020) (finding that a petitioner satisfied the third SIRVA QAI criterion where there was a complaint of radiating pain, but the petitioner was "diagnosed and treated solely for pain and limited range of motion to her right shoulder"); *Cross v. Sec'y of Health & Hum. Servs*., No. 19-1958V, 2023 WL 120783, at *7 (Fed. Cl. Spec. Mstr. Jan. 6, 2023) (finding that "despite the notations of pain extending beyond the shoulder, Petitioner's injury is consistent with the definition of SIRVA and there is not preponderant evidence of another etiology").

Here, Petitioner in some isolated circumstances reported instances of pain extending beyond the shoulder, or instances of when compensation for his left shoulder pain caused a worsening of pain in other areas (i.e., the back and neck). *See,* e.g., Ex. 3 at 20. However, his treaters agreed his injury was otherwise consistent with SIRVA. *See,* e.g., Ex. 9 at 107; *see also Durham v. Sec'y of Health & Hum. Servs.,* No. 17-1899V, 2023 WL 3196229, at *11-13 (Fed. Cl. Spec. Mstr. Apr. 7, 2023) (finding "this is not a case where the medical records reflect that the symptoms beyond the confines of the shoulder are incidental to what was otherwise clearly treated as a shoulder injury," as the petitioner showed prominent symptoms of radiculopathy/numbness into the hand and neck, there ultimately was not any confirmed final diagnosis of a shoulder joint pathology,

and a cervical etiology was deemed more likely by physicians). The evidence supporting a SIRVA can be distinguished from other incidental complaints of pain stemming from the shoulder into the neck and back – and those complaints can also be disregarded in determining damages. Petitioner has therefore established this QAI criterion.

### 4. There is No Evidence of Another Condition or Abnormality

The last criterion for a Table SIRVA states that there must be no other condition or abnormality which would explain a petitioner's current symptoms. 42 C.F.R. § 100.3(c)(10)(iv). Respondent does not dispute this element, and I thus find it is met.

### C. Other Requirements for Entitlement

In addition to establishing a Table injury, a petitioner must also provide preponderant evidence of the additional requirements of Section 11(c). Respondent does not dispute that Petitioner has satisfied these requirements in this case, and the overall record contains preponderant evidence to fulfill these additional requirements.

As I have previously determined, the record shows that Petitioner received a flu vaccine intramuscularly in his left shoulder on September 17, 2020, in Utah. *See* Section 11(c)(1)(A) (requiring receipt of a covered vaccine); Section 11(c)(1)(B)(i)(I) (requiring administration within the United States or its territories). There is no evidence that Petitioner has collected a civil award for his injury. Section 11(c)(1)(E) (lack of prior civil award). As stated above, I have found that the onset of Petitioner's left shoulder pain was within 48 hours of vaccination. *See* 42 C.F.R. § 100.3(c)(10)(ii) (setting forth this requirement). This finding also satisfies the requirement that Petitioner's first symptom or manifestation of onset occur within the time frame listed on the Vaccine Injury Table. 42 C.F.R. § 100.3(a)(XIV)(B) (listing a time frame of 48 hours for a Table SIRVA following receipt of the influenza vaccine). Therefore, Petitioner has satisfied all requirements for a Table SIRVA. Additionally, Petitioner has established the six-month severity requirement. *See* Section 11(c)(1)(D)(i) (statutory six-month requirement). I therefore find that Petitioner is entitled to compensation in this case.

### Conclusion

**In view of the evidence of record, I find that there is preponderant evidence that Petitioner received the subject flu vaccination in his left shoulder on September 17, 2020. Further, based on the evidence of record, I find that Petitioner has established a Table SIRVA and is therefore entitled to compensation. A separate order regarding damages will be issued along with the instant Ruling.**

**IT IS SO ORDERED.**

<u>**s/Brian H. Corcoran**</u>
Brian H. Corcoran
Chief Special Master